# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 98-1494

_____

| | | |
|---|---|---|
| Donald James Gralike, | * | |
| | * | |
| Plaintiff-Appellee, | * | |
| | * | |
| Mike Harman, | * | |
| | * | |
| Intervenor on Appeal, | * | |
| | * | |
| v. | * | |
| | * | |
| Rebecca McDowell Cook, | * | |
| | * | Appeal from the United States |
| Defendant-Appellant. | * | District Court for the |
| ----------------------------------- | * | Western District of Missouri |
| | * | |
| Professor Kris W. Kobach, | * | |
| | * | |
| Amicus on Behalf of Appellant. | * | |
| | * | |
| League of Women Voters of the United | * | |
| States; League of Women Voters of | * | |
| Missouri, | * | |
| | * | |
| Amici on Behalf of Appellee. | * | |

_____

Submitted:  November 16, 1998

Filed: August 31, 1999

_____

_____

Before McMILLIAN, FLOYD R. GIBSON and HANSEN, Circuit Judges.

_____

McMILLIAN, Circuit Judge.


Appellant Rebecca McDowell Cook, in her official capacity as Secretary of State of the State of Missouri, appeals from a final order entered in the United States District Court[1] for the Western District of Missouri granting summary judgment in favor of appellee Donald James Gralike, and invalidating as unconstitutional the 1996 Missouri ballot initiative concerning term limits for members of the United States Congress, codified at Article VIII, Sections 15-22 of the Missouri Constitution.[2] See Gralike v. Cook, 996 F. Supp. 917 (W.D. Mo. 1998)(Gralike III). For reversal, Cook argues that the district court erred in granting summary judgment for appellee because the amendment does not violate the First Amendment or Articles I or V of the United States Constitution. For the reasons discussed below, we affirm the judgment of the district court.


Jurisdiction in the district court was proper based upon 28 U.S.C. §§ 1331, 1343. Jurisdiction on appeal is proper based upon 28 U.S.C. § 1291. The notice of appeal was timely filed pursuant to Fed. R. App. P. 4(a).

_____

[1]The Honorable D. Brook Bartlett, United States District Judge for the Western District of Missouri.

[2]In this order, the District Court referred to its January 29, 1998 order, 996 F.Supp. 901 (W.D.Mo. 1998), for the legal analysis supporting its decision that the amendment was unconstitutional on Article I, Free Speech, Article V, and vagueness grounds.

## I. BACKGROUND

In November 1996 the voters of Missouri passed an amendment to Article VIII of the Missouri Constitution (hereinafter "Missouri Amendment" or "Amendment") to limit the number of terms any individual may serve in the United States Congress. The Amendment seeks to limit congressional service to three terms in the House of Representatives and two terms in the Senate.[3] See MO. CONST. Art. VIII, § 16. To achieve this goal, the Missouri Amendment orders members of Missouri's congressional delegation to use their authority to amend the United States Constitution

---

[3]Similar initiatives were on the ballot in thirteen other states in November 1996. In Alaska, Arkansas, Colorado, Idaho, Maine, Nebraska, Nevada and South Dakota voters approved the initiatives, while in Montana, North Dakota, Oregon, Washington, and Wyoming they rejected them. See Robert Pear, The 1996 Elections: The States–The Initiatives, N. Y. Times, Nov. 7, 1996, at B7.

As of the writing of this opinion, the initiatives in Arkansas, Colorado, Idaho, Maine, Nebraska, South Dakota, and Missouri have been invalidated in federal and state courts on various state and federal constitutional grounds. See Miller v. Moore, 169 F.3d 1119 (8th Cir. 1999) (Nebraska initiative invalidated on Article V and right to vote grounds); Barker v. Hazeltine, 3 F. Supp. 2d 1088 (D.S.D. 1998) (invalidated on Article V, First Amendment, Speech and Debate, and Due Process grounds); League of Women Voters of Maine v. Gwadosky, 966 F. Supp. 52 (D. Me. 1997) (invalidated on Article V grounds); Donovan v. Priest, 931 S.W.2d 119 (Ark. 1996) (a pre-election challenge, initiative invalidated on Article V grounds); Morrissey v. Colorado, 951 P.2d 911 (Colo. 1998) (invalidated on Article V grounds); Simpson v. Cenarrusa, 944 P.2d 1372 (Idaho 1997) (invalidated on First Amendment, Speech and Debate Clause, and state constitutional grounds.); In re: Initiative Petition No. 364, State Question No. 673, 930 S.W.2d 186 (Okla. 1996) (invalidated on Article V and state constitutional grounds).

Yet another similar initiative was passed in California in June 1998. The Supreme Court of California invalidated it on Article V and state initiative law grounds. See Bramberg v. Jones, 20 Cal.4th 1045, 1054-64 (Cal. 1999).

to impose the term limits in § 16 on Congressional service.  See id. § 17.

If a Missouri Representative or Senator fails to comply with this order, the Missouri Amendment dictates that the label "DISREGARDED VOTERS' INSTRUCTION ON TERM LIMITS" be printed next to his or her name on all ballots during the next election.  Id.  The Missouri Amendment defines a failure to comply with the instructions as: (1) failure to vote in favor of a term limit amendment conforming with § 16; (2) failure to second it if a second is lacking; (3) failure to propose or otherwise bring to a vote a term limit amendment conforming with § 16; (4) failure to vote favorably on measures to bring such an amendment before committee; (5) failure to vote against all measures to delay, table, or otherwise prevent a vote by the full body; (6) failure to vote against amendments allowing longer terms of Congressional service than § 16 allows; (7) sponsoring or cosponsoring an amendment with longer terms than those in § 16; and (8) failure to ensure that all votes on term limits are recorded and available to the public.  See id.

The Missouri Amendment requires non-incumbent candidates to take a pledge to use their authority to amend the United States Constitution to impose the term limits in § 16 if elected.  It orders that those who do not take the pledge have the label "DECLINED TO PLEDGE TO SUPPORT TERM LIMITS" printed next to their names on the ballot.  Id. § 18.  To avoid being labeled on the ballot, non-incumbent candidates must take the following pledge:

> I support term limits and pledge to use all my legislative powers to enact the proposed Constitutional Amendment set forth in the Term Limits Act of 1996.  If elected, I pledge to vote in such a way that the designation "DISREGARDED VOTERS' INSTRUCTION ON TERM LIMITS" will not appear adjacent to my name.

§ 18(3).

For both incumbent and non-incumbent candidates, the Missouri Amendment requires the Secretary of State to decide whether a label will be printed on the ballot and to consider public comment in making that determination. See id. § 19 (1-4). It allows individual voters to appeal the Secretary of State's decision not to print the label by a candidate's name directly to the Missouri Supreme Court, in which case the Secretary of State must produce clear and convincing evidence that the candidate conformed with the initiative or took the pledge. It also permits a candidate, whom the Secretary of State decides shall have the label appear next to his or her name on the ballot, to appeal this decision to the Missouri Supreme Court, in which case the candidate must produce clear and convincing evidence why the label should not be printed on the ballot. See id. § 19(5, 6). In addition, the Missouri Amendment automatically repeals itself if and when the United States Constitution is amended to conform with the § 16 term limits. See id. § 20. It also grants the Missouri Supreme Court original jurisdiction to hear challenges to the Amendment. See id. § 21. Finally, it contains a severability clause. See id. § 22.

Soon after its passage, appellee initiated this action in federal district court challenging the Missouri Amendment on several federal constitutional grounds. Appellee is not currently a member of the Missouri congressional delegation, but he was a candidate for the third district Congressional seat in 1998 and has issued a declaration of his intent to run for the same seat in 2000. The district court issued three memorandum orders addressing different motions by the parties. In the first order, the district court denied in part and granted in part appellant's motion to dismiss, finding that appellee did have standing to sue, did meet the requirements for injunctive relief, that appellant was not protected by Eleventh Amendment immunity, that the court need not abstain from judgment since there were no unanswered questions of state law, and that the court need not certify questions of federal law to the Missouri Supreme Court

since that court has held that it lacks jurisdiction over such questions.[4]  See Gralike v. Cook, 996 F. Supp. 889 (W.D. Mo. 1998) (Gralike I).  In its second order, the district court granted in part and denied in part appellant's motion to dismiss for failure to state a claim; it denied appellant's motion to dismiss appellee's claims that the Missouri Amendment violates Article I, Article V, and the First and Fourteenth Amendments of the United States Constitution, but granted her motion to dismiss appellee's claim that § 21 of the Missouri Amendment violates the Supremacy Clause of the United States Constitution.  See id., 996 F. Supp. 901 (W.D. Mo. 1998) (Gralike II).   In its final order in this case, the district court granted appellee's motion for summary judgment on his Article I, Article V, and First Amendment Claims; the district court did not reach plaintiff-appellee's Due Process vagueness claim because it determined that the other three claims were sufficient to dispose of the case.  See id., 996 F.Supp. 917 (W.D.Mo. 1998)(Gralike III).  The district court, in Gralike III, relied upon its earlier order in Gralike II for the analysis supporting its decision to grant summary judgment for plaintiff-appellee.  Judgment was entered for appellee, and appellant timely appealed.

## II. DISCUSSION

We review decisions to grant summary judgment de novo, reviewing the facts in the light most favorable to the non-moving party.  See Barnhart v. UNUM Life Insurance Co. of America, No. 98-3350, Slip Op. at 7 (8th Cir. May 28, 1999).  We will affirm a grant of summary judgment if, viewed in the light most favorable to the non-moving party, no genuine issue of material fact exists and the moving party is

---

[4]The District Court cited Zeman v. V.F. Factory Outlet, Inc., 911 F.2d 107, 108-09 (1990) (discussing the Missouri Supreme Court's order in Zeman v. V.F. Factory Outlet, Inc., No. 72613 (Mo. July 13, 1990)(refusing to accept questions certified by federal courts)).  See Gralike v. Cook, 996 F. Supp. 889, 901 (W.D. Mo. 1998) (Gralike I).

entitled to judgment as a matter of law.  See, e.g., Hughes v. Ortho Pharmaceutical Corp., No. 98-2218, Slip Op. at 4-5 (8th Cir. May 27, 1999).

## A. FIRST AMENDMENT

Appellant argues that the district court erred in holding that the Missouri Amendment violates the First Amendment guarantee of free speech.  First, she argues that, because the Missouri Amendment imposes no sanction on candidates for United States Congress for failure to speak, the district court erred in concluding that the Missouri Amendment compels or coerces candidates to speak.  Second, she argues that the district court should not have analyzed the Missouri Amendment under strict scrutiny review, but rather should have balanced candidates' right to keep their views on term limits secret with the electorate's right to know the views of candidates. Furthermore, she points out, the Amendment was the result of a popular election, and the courts should be especially careful when considering legislation passed by direct democracy.  We agree with the district court's well-reasoned analysis, and reject appellant's arguments.

### 1. Compelled speech

It is well established that the First Amendment to the United States Constitution bars not only state action which restricts free expression but also state action which compels individuals to speak or express a certain point of view.  See Wooley v. Maynard, 430 U.S. 705, 714 (1977) (Wooley); West Virginia State Board of Education v. Barnette, 319 U.S. 624, 642 (1943) (Barnette); see also Miami Herald Publishing Co. v. Tornillo, 418 U.S. 241(1974) (Miami Herald); cf. Scope Pictures v. City of Kansas City, 140 F.3d 1201(8th Cir. 1998); United States v. Sindel, 53 F.3d 874 (8th Cir. 1995).  Moreover, "[t]he burden upon freedom of expression is particularly great where, as here, the compelled speech is in the public context."  Lehnert v. Ferris Faculty Ass'n, 500 U.S. 507, 522 (1991).  We hold that the Missouri Amendment is an

impermissible attempt by the State of Missouri to compel candidates to express a point of view on term limits. Accord Barker v. Letellier, 3 F.Supp. 1088, 1096 (D.S.D. 1998) (Barker) (invalidating a nearly identical term limit initiative passed in South Dakota on First Amendment grounds, in part); Simpson v. Cenarrusa, 944 P.2d 1372, 1375-76 (Idaho 1997) (Simpson)(invalidating similar term limit initiative in Idaho on First Amendment grounds, among other grounds).

In Wooley, the Supreme Court invalidated the conviction of a New Hampshire couple who covered the state motto "Live Free or Die" on their license plate, concluding that "the right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all." 430 U.S. at 714; see also Barnette, 319 U.S. at 642 ("If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein."). Since Wooley, the Supreme Court has reaffirmed the prohibition on compelled speech and refined it to apply to cases in which the government orders certain types of speech or speech about certain topics. For example, in Riley v. Nat'l Fed. of the Blind of North Carolina, Inc., 487 U.S. 781, 786 (1988), the Court invalidated on First Amendment grounds a North Carolina law which, among other things, required professional fund raisers, before soliciting donations, to disclose what portion of donations they turned over to the charities for which they solicited in the preceding twelve months. The Court concluded that the state law violated the First Amendment prohibition on state-compelled speech because "[t]he First Amendment mandates that we presume that speakers, not the government, know best both what they want to say and how to say it . . . . To this end, the government . . . may not substitute its judgment as to how best to speak for that of speakers and listeners . . . ." Id. at 790-91; see also Pacific Gas & Electric Co. v. Public Utilities Comm'n of California, 475 U.S. 1, 14-16 (1986)(Pacific Gas)("the State is not free either to restrict appellant's speech to certain topics or views

-8-

or to force appellant to respond to views that others may hold . . . . [T]he choice to speak includes within it the choice of what not to say . . . .").

The Missouri Amendment compels candidates to speak about term limits. First, it attempts to force candidates to speak in favor of term limits by threatening them with the ballot label if they fail to do so. Second, if a candidate refuses to speak in favor of term limits, the label on the ballot forces him or her to speak in opposition to the Amendment by noting that he or she failed to follow the voters' wishes. Either way, the Missouri Amendment does not allow candidates to remain silent on the issue, which is precisely the type of state-compelled speech which violates the First Amendment right not to speak. First, the Missouri Amendment selects the topic for public debate: term limits. Second, it chooses an approved position: favoring term limits. Third, it provides the actual words which non-incumbent candidates shall speak: the pledge. Finally, in the event its attempts to compel speech in favor of term limits fail, the Missouri Amendment provides a mechanism to compel candidates to speak in opposition: the ballot labels.

Appellant attempts to distinguish the Missouri Amendment from other compelled speech cases by arguing that the Missouri Amendment does not compel speech because it imposes no criminal or monetary sanction for refusing to speak. Rather, the only possible sanction the Missouri Amendment could impose, appellant argues, is the exposure of candidates' views and/or record on term limits. We disagree. As a threshold matter, we note that the concept of compelled speech has never been limited to those cases in which the state seeks to impose or compel speech through threat of financial or criminal sanction. See, e.g., Miami Herald, 418 U.S. at 258 ("Even if a newspaper would face no additional costs to comply . . . the Florida statute [compelling speech] fails to clear the barriers of the First Amendment . . . ."). Nevertheless, we believe that the Missouri Amendment in fact threatens a penalty that is serious enough to compel candidates to speak--the potential political damage of the ballot labels. See

Miller v. Moore, 169 F.3d 1119, 1125(8th Cir. 1999) (Moore); accord Barker, 3 F. Supp. 2d at 1094-95.

Contrary to appellant's contentions that the labels only provide information about the candidates' views, the labels do far more than advise voters of a candidates' opposition to term limits.[5] The labels are phrased in such a way they are likely to give (and we believe calculated to give) a negative impression not only of a labeled candidate's views on term limits, but also of his or her commitment and accountability to his or her constituents. See Moore, 169 F.3d at 1125; accord Barker, 3 F. Supp. 2d at 1094-95; League of Women Voters of Maine v. Gwadosky, 966 F. Supp. 52, 59-61(D. Me. 1997)(Gwadosky); Donovan v. Priest, 326 Ark. 353, 370(Ark. 1996) (Donovan); Morrissey v. State, 951 P.2d 911, 916(Colo. 1998) (Morrissey). The non-incumbent label "DECLINED TO PLEDGE TO SUPPORT TERM LIMITS," in light of the preamble and § 16 of the Amendment which state that the people of Missouri desire term limits, indicates that a candidate so labeled refused to promise to do the people's bidding. The incumbent label "DISREGARDED VOTERS' INSTRUCTION ON TERM LIMITS" indicates that, during the preceding term, the candidate failed to act in accordance with his or her constituents' wishes. Each label implies that a labeled candidate cannot be trusted to carry out the people's bidding, which in turn casts doubt on his or her suitability to serve in Congress.

The pejorative nature of the labels is heightened by the fact that there are no labels for candidates who take the pledge or comply with the mandates of §17 while in office. The only "information" the Missouri Amendment adds to the ballot is derogatory labels for candidates who do not do what it requires. Furthermore, the

---

[5]Thus the question of whether the label is damaging does not turn so much on the impact of voter reaction to the fact that a candidate opposes or supports term limits, as appellant suggests, but more so on the language in the label that advises the voters of the candidate's purported opposition.

labels are particularly harmful because they appear on the ballot, an official document produced by the state.[6] Thus, the labels appear to be an official denunciation of certain candidates who are singled out by the state for their failure to speak in favor of term limits or take all action that § 17 requires. Moore, 169 F.3d at 1125 ("[the] ballot labels effectively place the state's official stamp of disapproval on . . . [candidates] whom the state disfavors because of their views on a single political issues. . ."; accord Barker, 3 F. Supp. 2d at 1094, Gwadosky, 966 F. Supp. at 61; Donovan, 326 Ark. at 370 ("[the labels] are equivalent to an officially sanctioned recommendation by the State. . . not to vote for such candidates because they disregarded the instructions and wishes of the voters."). The ballot labels are a serious sanction, which we believe is sufficient to coerce candidates to speak out in favor of term limits rather than risk the political consequences associated with being labeled on the ballot. Moreover, the fact that the label appears on the ballot compels candidates to speak because the labels themselves constitute speech. Once the label is on the ballot, it ascribes a point of view to the labeled candidate.

Arguing that the First Amendment does not insulate candidates from the electorate, appellant points out that individuals become subject to the Missouri Amendment only if they chose to run for office. However, "[a] political candidate does not lose the protection of the First Amendment when he [or she] declares himself [or herself] for public office." Brown v. Hartlage, 456 U.S. 45, 53 (1982). An individual's choice to serve the public by seeking congressional office does not grant the state licence to restrict or compel his or her speech. On the contrary, speech restrictions are particularly destructive in the political arena, where the importance of free exchange of ideas and information--a vital aspect of our democratic system--is at its zenith. See id. Furthermore, "[t]he identity of the speaker is not decisive in determining whether

---

[6]Moreover, the labels appear at the critical instant of voting, during which the labeled candidate cannot contact the voter to defend himself or herself against the label.

speech is protected." Pacific Gas, 475 U.S. at 8. Thus we reject appellee's suggestion that candidates for public office are afforded diminished First Amendment protections.

## 2. Application of Strict Scrutiny

Appellant also argues that the district court erred in applying strict scrutiny analysis to determine the constitutionality of the Missouri Amendment. She contends that instead the district court should have applied a "balancing test" and upheld the Amendment since the electorate's right to know candidates' views on term limits outweighs that of candidates to remain silent on the issue. Appellee's Brief at 19 (hereinafter "App. Br."). We disagree.

The District Court correctly determined that the Missouri Amendment is subject to strict scrutiny review. First, as discussed above, the Amendment burdens candidates' right to free expression by compelling them to state or act in such a way as to portray a position on the § 16 term limits proposal. This is an impermissible restriction on core political speech, which subjects the Amendment to strict scrutiny review. See Meyer v. Grant, 486 U.S. 414, 425 (1988). However, even assuming for purposes of analysis that the Missouri Amendment did not compel political speech, strict scrutiny review is warranted because the Amendment is a content-based, viewpoint-specific restriction on candidates' right to free speech. See Burson v. Freeman, 504 U.S. 191, 198 (1992) (Burson) ("[A] facially content-based restriction on political speech in a public forum . . . must be subjected to exacting scrutiny); see also Turner Broadcasting System v. FCC, 512 U.S. 622 (1994).

The Missouri Amendment is content-based because it addresses the issue of term limits, completely ignoring all other issues. In addition, it is content-based because it compels candidates to speak about the issue of term limits, which they might not do absent state action. See Riley, 487 U.S. at 795 (state mandate of "speech that the speaker would not otherwise make necessarily alters the content of the speech").

Furthermore, the Missouri Amendment is viewpoint-specific because the labeling provisions single out individual candidates for punishment based only on their opposition–actual or ascribed–to term limits.[7] The Missouri Amendment only labels those who, according to the Secretary of State, oppose the Amendment's term limits proposal, and does nothing to those who pledge to support it. As such, the Missouri Amendment is a state-imposed, viewpoint specific restriction on candidates' speech which triggers strict scrutiny review. See Members of the City Council v. Taxpayers for Vincent, 466 US 789, 804 (1984) ("The general principle that has emerged . . . is that the First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others.")(citing Bolger v. Youngs Drug Products Corp., 463 U.S. 60, 65, 72 (1983); Consolidated Edison Co. v. Public Service Comm'n, 447 U.S. 530, 535-36 (1980); Carey v. Brown, 447 U.S. 455, 462-63 (1980); Young v. American Mini Theatres, Inc., 427 U.S. 50, 63- 65, 67-68 (1976) (plurality opinion); Police Department of Chicago v. Mosley, 408 U.S. 92 (1972)).

---

[7]The point of view the labels ascribe to candidates may not even be accurate. The Missouri Amendment assigns a label to non-incumbents who fail to pledge and to incumbents who fail to do one of the seven enumerated actions, regardless of whether the candidates in fact oppose term limits. For example, a candidate who believed that terms should be limited to 12 years in the House rather than the six years the Amendment requires would receive the label even though he or she actually supports term limits in general. An incumbent candidate who supports term limits but failed to vote for a proposed amendment because it was linked to unfavorable legislation, for instance, could also be labeled on the ballot. Regardless of a candidate's opinion about term limits in general, if the candidate does not support the specific limit prescribed by the Missouri Amendment or if he or she does not see it fit to pursue the amendment process at any cost, he or she will be branded as an opponent to the Missouri Amendment and to the wishes of the voters of Missouri. Such ascriptions of view point are precisely the type of state-imposed speech from which individuals are protected by the First Amendment. See, e.g., Wooley v. Maynard, 430 U.S. 705 (1977).

We hold that the district court correctly determined that the Missouri Amendment should be subject to strict scrutiny review.[8]  To survive strict scrutiny review, appellant must prove that the Missouri Amendment is narrowly tailored to achieve a compelling government interest.  See Burson, 504 U.S. at 198 ("The State must show that the 'regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end.'") (quoting Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 36, 45 (1983)); Kirkeby v. Furness, 92 F.3d 655, 659 (8th Cir. 1996); see also Riley, 487 U.S. at 801 ("Broad prophylactic rules in the area of free expression are suspect.  Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms.") (quoting NAACP v. Button, 371 U.S. 415, 438 (1963)).

Appellant maintains that the Missouri Amendment ensures the electorate's right to know candidates' views.  We construe this to mean that voter education is the

---

[8]Appellant urges us to determine the appropriate level of scrutiny by applying the Supreme Court's reasoning in Burdick v. Takushi, 504 U.S. 428 (1992) (Burdick). Burdick was a voting rights case brought by an individual voter challenging Hawaii's absolute ban on write-in voting.  The plaintiff alleged that the ban violated his First and Fourteenth amendment rights.  The Court advocated an inquiry into the degree of state interference with First and Fourteenth Amendment rights to determine the level of scrutiny to apply, stating that tate election regulations which severely restrict those rights must be narrowly tailored to achieve a compelling State interest but that regulations that impose only "reasonable, non-discriminatory restrictions" are generally justified with important state interests.  See id. at 434.

Although the present case differs from Burdick is significant regards, we believe that applying the Burdick test also mandates strict scrutiny.  The Missouri Amendment is not a reasonable, nondiscriminatory restriction on candidates' First and Fourteenth Amendment rights, rather it is a content-based and viewpoint-specific interference with candidates' right to free speech.  As such, Burdick would require a narrowly tailored regulation to achieve a compelling state interest.

-14-

compelling state interest the Missouri Amendment is meant to achieve. While we agree that an informed electorate is important in our democratic system of government, we hold that the Missouri Amendment fails strict scrutiny review because it is not narrowly tailored to achieve the goal of voter education. First, the Missouri Amendment only provides information about candidates views on term limits, neglecting every other issue. Although the voters of Missouri obviously feel strongly about term limits, we believe that a state measure that informs voters only of candidates' views on term limits does not ensure an informed electorate. Second, the Missouri Amendment is not narrowly tailored to achieve even the more limited goal of informing voters of candidates' views on term limits, because it can falsely identify candidates. For example, the Amendment could require the placement of a ballot label next to the name of a term limits supporter who failed to comply with an aspect of §17(2). See also supra note 7. Finally, there are less restrictive means to promote voter education, which indicates that the Missouri Amendment is not narrowly tailored. See, e.g. Boos v. Barry, 485 U.S. 312, (1988). For example, Missouri could institute voluntary programs, such as debates or voter information guides, to provide information about candidates' views on term limits and other important issues. Such programs advance the State's interest in informing voters without compelling candidates to speak or restricting their right not to speak.

Since appellant failed to prove that the labeling provisions of the Missouri Amendment are narrowly tailored to achieve a compelling state interest, she has failed to justify its infringement on candidates' right to free speech. The label provisions of the Missouri Amendment are barred by the First Amendment as applicable to the States through the Fourteenth Amendment.

## B. SPEECH AND DEBATE CLAUSE [9]

A related issue, which applies more appropriately to incumbent candidates, is whether the Missouri Amendment violates Article 1, section 6, clause 1 of the United States Constitution--the Speech and Debate Clause, which states, in relevant part: ". . . for any Speech or Debate in either House, they [Senators and Representatives] shall not be questioned in any other Place." The Missouri Amendment contravenes this guarantee because it establishes a regime in which a state officer--the secretary of state--is permitted to judge and punish members of Congress for their legislative actions or positions. Accord Barker, 3 F.Supp. at 1096; Simpson, 944 P.2d at 1375.

The Missouri Amendment specifically vests in the secretary of state of Missouri the responsibility to determine when the ballot label shall appear next to the name of an incumbent candidate. See MO. CONST. art. VIII, § 19. In so doing, she is to accept and consider public comments. See id. at § 19(3). As we discussed above, the ballot label "DISREGARDED VOTERS' INSTRUCTION ON TERM LIMITS" is a pejorative label with politically damaging ramifications, which amounts to punishment. Thus, the Missouri Amendment establishes a system by which Senators and Representatives are questioned about and can be punished for speech, debate, and actions in Congress. This system contradicts the protections of the Speech and Debate clause, which is intended to allow Senators and Representatives to speak and vote their

---

[9]Although the district court did not address this issue, we believe it is necessary to demonstrate why the Missouri Amendment is invalid as applied to incumbent candidates. Since the situation of incumbent candidates is somewhat different than that of non-incumbent candidates, the First Amendment issues discussed in Section II A do not apply as squarely to incumbent candidates. As such we exercise our discretion to affirm the judgment on this ground, although it was not considered by the district court. See United States v. Sager, 743 F.2d 1261, 1263 n.4 (8th Cir. 1984) ("We review judgments, not opinions, and we may affirm on any ground supported by the record, whether or not that ground was urged below or passed on by the district court."); see also Wisdom v. First Midwest Bank, 167 F.3d 402, 406 (8th Cir. 1999) (quoting Stevens v. Redwing, 146 F.3d 538, 543 (8th Cir. 1998).

conscience without fear of retribution.  See Gravel v. United States, 408 U.S. 606, 616 (1972) ("The Speech or Debate Clause was designed to assure a co-equal branch of the government wide freedom of speech, debate, and deliberation without intimidation or threats . . . that directly impinge upon or threaten the legislative process").

The portions of the Missouri Amendment dealing with labeling incumbent candidates based on their legislative speech and actions violate of the Speech and Debate clause.  Accord Barker, 3 F Supp. at 1096; Simpson, 944 P.2d at 1375.

## C.  QUALIFICATIONS CLAUSE

Appellant next contends that the district court erred in concluding that the Missouri Amendment constitutes an impermissible qualification for candidacy for the United States Congress in violation of the Qualifications Clause, Article 1 of the United States Constitution.  Appellant argues that the Missouri Amendment does no more than provide information about candidates and does not constitute a qualification within the meaning of Article I.  We disagree.

We believe that Qualifications Clause issues raised in this case were addressed by the Supreme Court in U.S. Term Limits v. Thornton, 514 U.S. 779 (1995).  In that case the Court held that an amendment to the Arkansas Constitution, which banned the names of incumbents who had served more than two terms in the United States Senate or three terms in the United States House of Representatives from appearing on the ballot, established an impermissible additional qualification for candidacy for Congress. See id. at 829-30.  After conducting a thorough historical review, the Court determined that neither the Framers, the constructs of our democratic society, the text of the Constitution itself, nor past Congressional action supported the contention that states may impose additional or different qualifications than those set out in the Qualifications Clause.  See id. at 827.  Rather, the Court stated, any state authority to set qualifications for Congress was abrogated by the ratification of the Constitution, and

the sole source of qualifications for Congressional office is contained in Article I.  See id. at 801.  Thus, any attempt by a state to alter or add to these qualifications is clearly proscribed by the Constitution.[10]

---

[10]In US Term Limits v. Thornton, 514 U.S. 779 (1995) (US Term Limits) the Supreme Court pointed out, there is unanimity among courts which have considered whether states can add to or change Article I qualifications.  The Court cited a litany of cases which struck state-initiated attempts to alter Article I qualifications:

> Chandler v. Howell, 104 Wash. 99, 175 P. 569 (1918); Eckwall v. Stadelman, 146 Ore. 439, 446, 30 P.2d 1037, 1040 (1934); Stockton v. McFarland, 56 Ariz. 138, 144, 106 P.2d 328, 330 (1940); State ex rel. Johnson v. Crane, 65 Wyo. 189, 197 P.2d 864 (1948); Dillon v. Fiorina, 340 F. Supp. 729, 731 (D. N. M. 1972); Stack v. Adams, 315 F. Supp. 1295, 1297-1298 (N.D. Fla. 1970); Buckingham v. State, 42 Del. 405, 35 A.2d 903, 905 (1944); Stumpf v. Lau, 108 Nev. 826, 830, 839 P.2d 120, 123 (1992); Danielson v. Fitzsimmons, 232 Minn. 149, 151, 44 N.W.2d 484, 486 (1950); In re Opinion of Judges, 79 S.D. 585, 587, 116 N.W.2d 233, 234 (1962). Courts have struck down state-imposed qualifications in the form of term limits, see, e.g., Thorsted v. Gregoire, 841 F. Supp. 1068, 1081 (W.D. Wash. 1994); Stumpf v. Lau, 108 Nev. at 830, 839 P.2d at 123, district residency requirements, see, e. g., Hellmann v. Collier, 217 Md. 93, 100, 141 A.2d 908, 911 (1958); Dillon v. Fiorina, 340 F. Supp. at 731; Exon v. Tiemann, 279 F. Supp. 609, 613 (Neb. 1968); State ex rel. Chavez v. Evans, 79 N.M. 578, 581, 446 P.2d 445, 448 (1968) (per curiam), loyalty oath requirements, see, e. g., Shub v. Simpson, 196 Md. 177, 199, 76 A.2d 332, 341, appeal dism'd, 340 U.S. 881 (1950); In re O'Connor, 173 Misc. 419, 421, 17 N.Y.S.2d 758, 760 (Super. Ct. 1940),  [**34]  and restrictions on those convicted of felonies, see, e.g., Application of Ferguson, 57 Misc. 2d 1041, 1043, 294 N.Y.S.2d 174, 176 (Super. Ct. 1968); Danielson v. Fitzsimmons, 232 Minn. at 151, 44 N.W.2d at 486; State ex rel. Eaton v. Schmahl, 140 Minn. 219, 220, 167 N.W. 481 (1918) (per curiam).

US Term Limits, 514 U.S. at 798-99.

Furthermore, the Court found that indirect attempts to modify Congressional qualifications were equally infirm. Although the Arkansas Amendment did not prohibit incumbents from service in Congress, the Court rejected the petitioner's contention that the Arkansas Amendment did not impose an impermissible qualification because incumbents could still be elected as write-in candidates. See id. at 830-31. The Court determined that States cannot achieve by indirect means what is constitutionally prohibited by direct means. See id. at 829. To identify impermissible indirect attempts to alter qualifications for Congress, the Court devised a two-part test: "[]a state amendment is unconstitutional when it has the likely effect of handicapping a class of candidates and has the sole purpose of creating additional qualifications indirectly." Id. at 836.

The Missouri Amendment fails US Term Limit's test. First, the Amendment specifically targets a distinct class of candidates–those who oppose term limits, refuse to take the term limits pledge, or fail to do one or more of the actions prescribed by the Amendment while serving in Congress. This class of candidates is singled out on the ballot with the damaging labels. The label provisions will have the likely effect of coercing candidates to support the term limits mandate or removing candidates who fail to do so by persuading voters not to elect them. As we discussed above, the ballot labels cast doubt on labeled candidates' ability to represent constituents, since the labels state that labeled candidates ignore their constituents' wishes. As such, the Missouri Amendment is likely to handicap labeled candidates' ability to be elected.

Second, as discussed above, the Missouri Amendment has the sole, expressed purpose of adding the qualification to congressional service that candidates must have served fewer than three terms in the House or two terms in the Senate. Sections 15 and 16 of the Missouri Amendment state that the people of Missouri seek to limit the number of terms of service in Congress to three in the House and two in the Senate. To attain this goal, the Missouri Amendment requires members of the Missouri congressional delegation to pursue the Article V amendment process, and it enforces

this mandate with the threat of the ballot labels. See MO. CONST. art. VIII, § 17. Thus, adding the term limit qualification is the sole purpose of the Missouri Amendment. The fact that the Missouri Amendment seeks to do so by compelling members of Congress from Missouri to initiate, pursue, and support the Article V amendment process does not change the analysis under US Term Limits, as it is still an indirect attempt to add a qualification to those listed in the Qualifications Clause. Since the Missouri Amendment seeks to impose an additional qualification for candidacy for Congress and does so in a manner which is highly likely to handicap term limit opponents and other labeled candidates, it fails the US Term Limits test.[11] See 504 U.S. at 829.

## D. ARTICLE V

Lastly, appellant argues that the district court erred in holding that the Missouri

---

[11]Appellant attempts to demonstrate that the Supreme Court has rejected Qualifications Clause challenges to State election practices, citing Tashjian v. Republican Party, 479 U.S. 208 (1986) (Tashjian). However, appellant's attempt to draw parallels between Tashjian and the Missouri Amendment fail. Tashjian dealt with the effect of the Qualifications Clause on the qualification of independent voters to participate in the Connecticut Republican Party's primary. The Court stated that the Framers sought to prevent the disqualification of state voters from *voting* in federal elections through the Qualifications Clause. See id. at 228.

Appellant would have us extend Tashjian to allow state-imposed qualifications as long as they do not disqualify state residents from *running for* Congress; we decline to do so. Tashjian dealt with the issue of qualification to participate in the political process as voters. The Supreme Court held that the qualifications clause did not demand symmetrical qualifications for voters in state and federal elections. The Missouri Amendment, however, does not deal with the qualification of Missouri voters to vote in federal elections, but their qualification as candidates in the election.

Furthermore, appellant's citation to Tashjian to support the argument that only direct disqualifications violate the Qualifications Clause has already been rejected by the Supreme Court in US Term Limits v. Thornton. US Term Limits, 514 U.S. at 829.

Amendment violates Article V of the United States Constitution, which sets out the process through which the Constitution may be amended. She contends that the Missouri Amendment does not alter the Article V process. We disagree.

Article V of the United States Constitution sets forth the two processes through which the United States Constitution may be amended. Article V states in relevant part:

> the Congress, whenever two thirds of both Houses shall deem it necessary, shall propose Amendments to this Constitution, or on the Application of the Legislatures of two thirds of the several States, shall call a Convention for proposing Amendments, which, in either Case, shall be valid to all Intents and Purposes, as Part of this Constitution, when ratified by the Legislatures of three fourths of the several States, or by Conventions in three fourths thereof, as the one or the other Mode of Ratification may be proposed by the Congress . . . .

U.S. CONST. art. V. Article V specifically delegates the amendment process to legislative bodies, not the voters.

Supreme Court precedent supports the conclusion that the people have a limited, third-party role in the amendment process. In invalidating an Ohio constitutional amendment which required ratification of the Eighteenth Amendment by popular referendum, the Court held that the ratification of a constitutional amendment was a federal function derived from Article V, which delineates the sole methods for ratification. See Hawke v. Smith, 253 U.S. 221, 230 (1920). In Leser v. Garnett, 258 U.S. 130, 137 (1922), the Court held that the ratification of the Nineteenth Amendment was not subject to state-imposed restrictions on the amendment process. The Court again determined that state legislatures ratifying constitutional amendments assume a federal function, which "transcends any limitations sought to be imposed by the people of a State." Id. Article V envisions legislatures acting as freely deliberative bodies in

-21-

the amendment process and resists any attempt by the people of a state to restrict the legislatures' actions.

More recently, two state courts were confronted with voter-initiated attempts to direct the Article V amendment process. The Supreme Courts of California and Montana invalidated, on Article V grounds, voter initiatives that compelled the California and Montana State legislatures to apply to Congress to call a constitutional convention to consider a balanced budget amendment. See AFL-CIO v. Eu, 686 P.2d 609 (Cal.1984) (Eu); State ex rel. Harper v. Waltermire, 691 P.2d 826 (Mont. 1984) (Waltermire). In each case, the initiative required State legislators to continue in session without pay if they did not pass the necessary petitions within a specified period. Both courts determined that such voter-imposed restrictions on legislators' ability to deliberate the issues independently violated Article V. See Eu 686 P.2d at 706; Waltermire, 691 P.2d at 830.

Appellant maintains that Article V does not prohibit the electorate from directing elected officials to amend the Constitution. He relies principally on Kimble v. Swackhamer, 439 U.S. 1385 (1978), to support this contention. In that case then-Justice Rehnquist, sitting as Circuit Justice, denied an injunction against a non-binding referendum in Nevada about the Equal Rights Amendment. Justice Rehnquist reasoned that the referendum did not alter the Article V process because it only served to advise legislators of the people's wishes and legislators were free to disregard it. See id. at 1388.

However, the Missouri Amendment is far more than an advisory, non-binding show of voters' opinion on term limits. See, e.g., Moore, 169 F.3d at 1124; Barker, 3 F. Supp. 2d at 1093; Gwadosky, 966 F. Supp. at 57; Donovan, 931 S.W.2d at 367; Petition No. 364, 930 P.2d at 192-93. But see Simpson, 944 P.2d at 613 (holding that without the ballot labels, the term limit initiative is non-binding and thus permissible under Kimble). By its own terms, the Missouri Amendment requires Senators and

Representatives from Missouri to initiate and support the Article V process: "We, the Voters of Missouri, hereby *instruct* each member of our congressional delegation to use all of his or her delegated powers to pass the Congressional Term Limits Amendment." MO. CONST. art. VIII, § 17(1) (emphasis added); see also Moore, 169 F.3d at 1124 (interpreting Nebraska term limits initiative to bind members of Congress to "'proceed on a precise and inflexible course of action'") (quoting Morrissey, 951 P.2d at 916). Furthermore, the Missouri Amendment seeks to coerce members of Congress to comply with this mandate by threatening them with the politically-damaging ballot labels if they fail to do so. Thus, unlike the Nevada legislators in Kimble, members of Missouri's congressional delegation are not free to disregard the instruction embodied in the Amendment. See, e.g., Moore, 169 F.3d at 1124; Barker, 3 F. Supp. 2d at 1093; Gwadosky, 966 F. Supp. at 57; Donovan, 931 S.W.2d at 367; Petition No. 364, 930 P.2d at 192-93. But see Simpson, 944 P.2d at 613.

We cannot accept appellant's argument that the Missouri amendment does not alter the Article V process. Voter initiatives which seek to coerce legislators into proposing or ratifying a particular constitutional amendment violate Article V. As discussed above, the Missouri Amendment's ballot labels constitute such an attempt by the voters to directly influence the Article V process by directing Senators and Representatives from Missouri to support and pursue the proposal and ratification of a term limits amendment to the United States Constitution.

## III. CONCLUSION

The record, viewed in the light most favorable to appellant, reveals no genuine issue of material fact and that appellee is entitled to judgment as a matter of law because the Missouri Amendment violates the First Amendment, the Speech and Debate Clause, the Qualifications Clause, and Article V of the United States Constitution.[12]

---

[12]Judge Hansen dissents from our decision to strike the Missouri Amendment in its entirety and argues that, instead, we should sever §§ 17-19 and leave the remainder of the Amendment intact. If we followed Judge Hansen's recommendation, Article VIII of the Missouri Constitution would state that the people of Missouri seek to amend the United States Constitution by adding a term limit qualification for Congressional service. Although there would no longer be a State-imposed punishment for candidates who fail to support the proposed term limit, the Missouri Constitution would still contain: (a) a direct attempt by the people to amend the US Constitution and (b) an attempt by the State and people of Missouri to add a qualification to Article I. Because we believe that both these attempts are unconstitutional, we cannot follow Judge Hansen's suggestion, notwithstanding this court's decision in Miller v. Moore, 169 F.3d 1119 (8th Cir. 1999).

First, as we noted in Part IID, the people are not to play a direct role in the Article V amendment process. While we agree with Judge Hansen that advisory communication between the people and their elected officials is permitted, we believe that the Missouri Amendment constitutes more than such merely advisory communications, and, as such, is barred by Article V. Assuming for the purposes of analysis that a Circuit Justice opinion for the Ninth Circuit is binding precedent in the Eighth Circuit, we believe that Kimble is distinguishable. The referendum in Kimble was initiated by the Nevada legislature and specifically stated that "the result of the voting on this question does not place any legal requirement on the legislature or any of its members." 439 U.S. at 1386 (quoting 1977 Nev. Stats., ch. 174, §§ 3, 5). If the Missouri Amendment contained similar language, we would agree with Judge Hansen that it is not coercive. However, in the absence of such language, we believe that the memorialization in the Missouri Constitution of the people's intent to pass a specific amendment to the United States Constitution departs from the expressly advisory, non-

Accordingly, we affirm the judgment of the district court.

HANSEN, Circuit Judge, concurring in part and dissenting in part.

I readily concur with Part I of the opinion of the court and with those portions of Part II which declare the labeling provisions (§§ 17, 18, and 19) of the Missouri Amendment to be in violation of the Constitution. I write separately, however, specifically to assert my view that §§ 15 and 16 of the Missouri Amendment are severable pursuant to § 22 of the Amendment and are not independently unconstitutional under the court's reasoning in Part II. Because I believe §§ 15 and 16 remain legitimate political expressions of the citizens of Missouri, I must respectfully dissent from that portion of the court's opinion and judgment which sweeps away the entirety of the Missouri Amendment.

In <u>Miller v. Moore</u>, 169 F.3d 1119, 1126 (8th Cir. 1999), this court recently

---

binding referendum then-Justice Rehnquist found to be permissible in <u>Kimble</u> and comes closer to the direct involvement the Supreme Court disallowed in <u>Lesser</u> and <u>Hawke</u>. <u>See</u> Part IID, above.

Second, as we noted in Part IIC, states cannot constitutionally add to or alter the qualifications for federal office. <u>See</u> U.S. Const. art. I. Thus, §§ 15 and 16 are arguably barred by Article I because they are an attempt by a State to add to or change the qualifications for service in the United States Congress--as opposed to an Article V petition for a Constitutional convention from a State legislature to consider amending the United States Constitution.

Finally, we refuse to sever the Missouri Amendment on jurisprudential grounds, because if we choose to sever §§ 17-19, we must also sever portions of § 16 which are unconstitutional or superfluous in the absence of §§17-19. Such micro-management of the Missouri Constitution would entangle this court too much in State law issues. As such, we opt to abstain from such action.

held, while striking down several sections of a similar Nebraska term limits amendment, that the section declaring the official position of the citizens of Nebraska to be that their elected officials should enact a term limits amendment was severable and constitutional. The principle established in <u>Miller v. Moore</u> is equally applicable to the Missouri Amendment at issue in this case. Standing alone, §§ 15 and 16 are a legitimate, nonbinding form of political expression by the citizens of Missouri explaining their support for a specific term limits amendment to the United States Constitution.

The opinion of the court suggests that §§ 15 and 16 standing alone violate Article V and Article I of the federal Constitution because they are, respectively, "a direct attempt by the people to amend the US Constitution" and "an attempt by the State and people of Missouri to add a qualification to Article I." <u>See</u> <u>supra</u> at 24 n.12. With respect to the latter, I believe the people of Missouri indeed have the absolute right under Article V to propose in a public pronouncement an addition to or an alteration of the qualifications for congressional service found in Article I. Once §§ 17 through 19 are struck down, §§ 15 and 16 do not in any way add to or alter the current qualifications for Missouri's congressional delegation, nor do they affect in any way federal election procedures. Furthermore, § 15 could not be more explicit when it states that the purpose of the voter-approved initiative is to "lead to the adoption of the following U.S. Constitutional Amendment." Therefore, I see nothing unconstitutional about these efforts (§§ 15 and 16) by the people of Missouri to secure an amendment to Article I through the Article V process, and nothing in the decision in <u>U.S. Term Limits, Inc. v. Thornton</u>, 514 U.S. 779 (1995), suggests otherwise.

With respect to Article V, the "people" (that is, the citizenry) have more than "a limited, third party role in the amendment process." <u>See</u> <u>supra</u> at 21. In fact, "We the People" have at least as important a role in the process of amending the Constitution as they did in creating it. It was, after all, the "people" who forced the first ten amendments to be adopted. As the court correctly points out, the people have no

formal role in the amendment *procedures* set out in Article V. However, the people play a crucial, *substantive* role in the amendment process by bringing political pressure to bear--through political speech, mobilization, and other activities--on those who under the Constitution do control the formal procedures. Standing alone, §§ 15 and 16 are nothing more than the people of the state of Missouri exercising their political right to petition their elected representatives to enact a term limits amendment to the Constitution. The only "coercion" involved in this form of political expression is ordinary garden-variety political pressure, which certainly is not prohibited by the Constitution. Nothing in §§ 15 and 16 restricts the formal amendment procedures of Article V, and thus they should not be held to violate the Constitution.

I know of no precedent that prohibits the people of a state from expressing their political views through amendments to their state constitution, even if that expression involves matters of interest to or under the control of federal legislators, so long as the amendment is advisory and does not coerce elected officials into acting a certain way. See Kimble v. Swackhamer, 439 U.S. 1385, 1387-88 (1978) (Rehnquist, Circuit Justice). The court's opinion attempts to distinguish the principle in Kimble by arguing that the Missouri Amendment contains no specific language making it clear that it does not bind representatives. Whether the Amendment specifically states that it is nonbinding or not, the effect is the same--it is nonbinding. Once the labeling provisions found in §§ 17 through 19 are struck down, there are no longer any improper penalties imposed on elected officials and there is no longer an enforcement mechanism other than through the basic political process. It is true that §§ 15 and 16 still may be politically persuasive because they represent the views of a majority of the voters who voted on the issue. Because §§ 15 and 16 standing alone are not binding, however, they are not unconstitutional and should be allowed to stand as a democratically determined expression of the political will of the people of Missouri.

Finally, I see no reason why upholding §§ 15 and 16 is improper federal court micro-management of the Missouri Constitution. At most, the last clause of § 16 may be superfluous, but superfluity does not equal unconstitutionality. Nothing remaining in § 16 is unconstitutional, and I think the entire section could remain without severing any part of it. Furthermore, out of respect for the people of Missouri and their Missouri Constitution, I believe we become less entangled in state law issues by striking down only those portions of the Missouri Amendment that are clearly unconstitutional.

Accordingly, I respectfully dissent from that portion of the court's opinion that strikes down §§ 15 and 16 of the Missouri Amendment.


A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.